# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

Thea Mansavage,

        Plaintiff,

       v.                                  Case No. 16-cv-612

Landfill Venture Group,

        Defendant.

# COMPLAINT

## I. NATURE OF ACTION

101. This is a civil action brought pursuant to 42 U.S.C. § 1983 in order to obtain monetary damages as a result of the Defendant having violated the First Amendment rights of Thea Mansavage by terminating her employment as a site operator for the Landfill Venture Group as the result of her having brought the existence of a kick-back scheme at the landfill to the attention of law enforcement authorities.

## II. JURISDICTION AND VENUE

201. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (42 U.S.C. § 1983 jurisdiction).

202. The Western District of Wisconsin is the proper venue for this action because the Plaintiff's claims arose within the geographical boundaries of Vilas County in the Western District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## III. PARTIES

### A. Plaintiff

301. The Plaintiff, Thea Mansavage, is an adult resident of Wisconsin.

### B. Defendant

302. Defendant Landfill Venture Group is a municipal entity that was created pursuant to Wis. Stat. § 66.30 by the City of Eagle River and various townships located in Vilas County and to operate and maintain a solid waste disposal facility for those townships and city.

303. The Defendant was acting under color of state law within the meaning of 42 U.S.C. § 1983 in regard to the conduct asserted in this Complaint.

304. The Defendant's termination of the Plaintiff's employment was a policy decision within the meaning of *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

### IV. ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

401. The Landfill Venture Group operates the Highway G Landfill (hereinafter, "the Landfill") in Eagle River, Wisconsin and has done so since 1989.

402. The Landfill Venture Group is governed by a Commission composed of representatives from each township served by the Landfill.

403. The Commission appoints a three member Executive Committee that is responsible for the management of the day-to-day affairs of the Landfill and the Landfill Venture Group.

404. From at least January 1, 2014, to at least March 2, 2015, Charles Rayala, Charles Spencer, and Scott Maciosek, were the members of the Executive Committee.

405. On April 7, 2006, Thea Mansavage was hired as a full-time site operator at the Landfill.

406. Ms. Mansavage developed concerns about the practice of Landfill employees allowing certain disposal and recycling entrepreneurs to take high ticket items, usually metals, from the Landfill without paying the Landfill for them, after

which those individual would sell the items and then kick back a portion of the money to individual Landfill employees.

407. This arrangement, under which Landfill employees reaped private benefits from a public resource to which they had special access without the formal approval of the Commission or any other body with jurisdiction over the landfill, was a matter of public interest within the meaning of *Connick v. Myers*, 461 U.S. 138 (1983).

408. As early as 2008, Ms. Mansavage complained about this practice to her supervisor, Mark Busha, and refused to participate in the practice.

409. In 2010, with the practice continuing unabated, Ms. Mansavage began to complain about this practice, which she considered to be a type of embezzlement, to persons whom she perceived as having special credibility or influence with the Executive Committee.

410. In early 2010, she spoke to Dave Alleman, who was Vilas County Treasurer and the LVG representative from the Town of Washington, about her concerns.

411. On July 20, 2010, Ms. Mansavage and Dave Alleman met informally with Mr. Rayala to tell him about embezzlement of money from the unauthorized sale of metals occurring at the Landfill.

412. On May 25, 2011, Ms. Mansavage met with Vilas County Sheriff's Department Chief Deputy Joe Fath; at that meeting, she reported to him that individual

Landfill employees were receiving cash in exchange for allowing recyclers to take things of value out of the landfill.

413. Ms. Mansavage's complaints to the Sheriff's Department were well outside the scope of her duties as an employee of the landfill; she lodged them in her capacity as a citizen, within the meaning of *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

414. On December 6, 2012, Ms. Mansavage applied to be promoted to assistant manager at the Landfill, and in her letter applying for the position, she again outlined what she perceived as a problem: Landfill employees receiving payments for allowing recyclers to have free access to saleable metals in the Landfill; she was denied the promotion.

415. In 2013, the investigation of the Vilas County Sheriff's Office into the salvage scam intensified.

416. On March 19, 2013, Detective Sergeant Carl Gauger and Chief Deputy Fath met with Mr. Charles Rayala.

417. At the meeting, Mr. Rayala turned over a copy of a $1,058.40 check from DJ Recycling Services payable to Landfill employee Larry McCaughn, asserting he had no idea why McCaughn would have received a personal payment.

418. Mr. Rayala admitted that he was aware that Ray Straubel has been hauling materials out of the Landfill but claimed that the Landfill was supposed to get a portion of the proceeds although there was no contract with Straubel.

419. On March 26, 2013, Ms. Mansavage met with Detective Sergeant Gauger to again discuss the scrapping scam.

420. At that meeting, Ms. Mansavage said that she was concerned about what would happen if Landfill employees learned of her role in the Sheriff's investigation, and that she was concerned for her personal safety because everyone else who worked at the Landfill was involved in the scam.

421. The Sheriff's Department investigation stalled, and in April of 2014, Ms. Mansavage tried to revive interest in it by writing letters and making calls to the Vilas County Sheriff's Department.

422. These efforts on Ms. Mansavage's part were well outside the scope of her duties as an employee of the landfill; she undertook them in her capacity as a concerned citizen.

423. In the summer of 2014, Lt. Gauger suggested that the Wisconsin Department of Justice, Division of Criminal Investigation ("DCI") might be an asset to the investigation, so Ms. Mansavage contacted a DCI agent.

424. In July, 2014, DCI Special Agent Cindy Giese debriefed Ms. Mansavage who told her all of her concerns and supplied her with documentary evidence of the kickback operation.

425. On September 11, 2014, Lt. Gauger interviewed Ray Straubel, the owner of Straubel Disposal about his arrangements and transactions with the Landfill.

426. Mr. Straubel admitted that Landfill Supervisor Mark Busha allowed him to collect recyclable metals from the Landfill.

427. Mr. Straubel explained that he would separate the metals: copper, brass, aluminum, etc. and clean it.

428. Mr. Straubel reported that once he had accumulated enough metal for a load, he would take it to Sadoff Iron and Metal in Green Bay and sell it.

429. Mr. Straubel reported that he would then return a percentage of the money he took in to Mark Busha. He said that the payment was almost always in cash.

430. Mr. Straubel said that in 2012, he and Mark Busha entered into a contract due to pressure from Thea Mansavage, and as a result, Straubel was required to make a payment by check, in a check made out to Landfill Venture Group, but he only paid that way once, in February, 2013.

431. On December 4, 2014, Lt. Gauger had Facility Manager Mark Busha come to the Sheriff's office for an interview.

432. Mr. Busha admitted that he had agreements with a couple of companies (D.J.'s and Straubel) to haul away metals that had been separated from the trash in the landfill. The arrangement was that they would sell the metal and then return a portion of the proceeds in cash to Mr. Busha; Mr. Busha said he put the money into the "boot fund."

433. Mr. Busha said that no records had been kept of these transactions.

434. Mr. Busha explained that the LVG had not cared how the Landfill had been run as long it was self-sustaining, and there had been no policies against these types of transactions. Only recently had new policies had been written governing the sale and retention of items brought to the Landfill.

435. When asked by Lt. Gauger about the performance of Thea Mansavage as an employee, Busha said that she has been a good worker, that she keeps her "nose to the grindstone."

436. The next day, on December 5, 2014, Lt. Gauger called Charles Rayala and asked him to confirm that prior to the creation of the recent written policies, there had been verbal instructions in place that allowed Landfill employees to remove items from the Landfill or allow others to remove them.

437. Mr. Rayala said that was correct, and that such a practice had been allowed until the adoption of the first written manual in 2012.

438. On January 13, 2015, Vilas County District Attorney Albert Moustakis publically announced that his office would not bring any criminal charges in connection with the investigation into the Landfill Venture Group.

439. District Attorney Moustakis's January 13, 2015, report on the matter indicated that Sheriff Fath would be writing a letter to LVG "as to suggested oversight."

440. On March 2, 2015 the Landfill Venture Group Commission met in closed session and terminated Ms. Mansavage's employment, effective March 4, 2015.

441.   The Commission's termination of Ms. Mansavage's employment was a reaction to the criminal complaints and other allegations she had made to law enforcement agencies recently.

442.   One June 15, 2015, the Landfill Venture Group amended its Employee Manual to include rules regarding the retention and distribution of materials brought to the Landfill.

## V.   VIOLATIONS OF LAW

501.   The retaliatory termination of Ms. Mansavage's employment by the Defendant Landfill Venture Group violated rights secured to Ms. Mansavage by the First and Fourteenth Amendments to the United States Constitution.

## VI.   DAMAGES

601.   By virtue of the Defendant's unlawful retaliatory termination of her employment, Ms. Mansavage has sustained lost wages, lost future earing capacity, emotional distress, reputational injury and other injuries for which she seeks an award of compensatory damages to make her whole.

## VII.   CONDITIONS PRECEDENT

701.   All conditions precedent to this action, within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant judgment against Defendant, awarding her:

901. Monetary damages in an amount that will fairly compensate Plaintiff for her injuries;

902. Her costs, attorneys' fees, and litigation expenses as well as any further relief that this Court deems just.

Dated this 6th day of September, 2016.

Respectfully submitted,

Thea Mansavage,

Plaintiff,

By

THE JEFF SCOTT OLSON LAW FIRM, S. C.
ATTORNEYS FOR PLAINTIFF
JEFF SCOTT OLSON
State Bar Number 1016284
131 West Wilson Street, Suite 1200
Madison, Wisconsin 53703
Phone   (608) 283-6001
Fax     (608) 283-0945
Email   JSOlson@scofflaw.com


/s/ Jeff Scott Olson
_____
Jeff Scott Olson